On behalf of Campus Investments, Mr. Sebastian Lucci. On behalf of the employee, Ms. Lyle Stultz. Good morning, Your Honors. Sebastian Lucci, on behalf of the appellants. Proceed, Judge. Thank you. Your Honors, this case is not about the benefits of wetlands, are they desirable? This is a case about statutory construction. And what I'd like to do is explain what I believe is some of the errors that have occurred in statutory construction. One of the problems is that if you're dealing with statutory construction that is not in an extraterritorial fashion, like in this case, you can go from the fact that it has to be expressly applied from the legislature, and then you can go into other things, like it has to be implied, and on and on, and like in this case, as the trial court did, which was manifesting reason. I believe that in this court, in the Siegel case, as noted in my reply brief in 2006, specifies that if it is an extraterritorial power, like in this case, the county regulating inside a village, it has to be express, and only express. And there's numerous decisions, and Your Honor, I believe also in the Harris Bank case, I believe you were on that case, it was the same thing. And if you look back historically for at least a hundred years, and it's noted in the Siegel case, that if it is extraterritorial, this court limits it very much so that it doesn't branch out, as has happened in this case, into other powers that are implied. Well, why is control of this not expressed in the statutory, the county's code, 1062? Why do you believe that the control of this area is not covered by that? Your Honor, the word wetlands is not in the statute, so wetlands is not there expressly, and the trial court even said that. So I think there's no question that expressly it's not there. The only way to get there after that is to disavow the fact that it's extraterritorial, and then to get that to some kind of implied fashion. And I submit that there is no basis for that in this case, because I'm not challenging the wetlands regulations within the county's unincorporated areas. They have express authority, or they have whatever they have within them. I'm talking about their authority in an incorporated village. And I believe that with the Siegel case, the Harris Bank case, and others, it has to be expressly provided for. The trial court itself has determined that it's not expressly provided for there. But the village, in this case, isn't certified pursuant to the procedure they've set up to enforce. Yes, Your Honor. So why then can't the county enforce with the ordinance in place? The reason, I submit, is that because what the county has done is they've created a mechanism to add wetlands to their regulations because they want to regulate those. Well, the Army Corps of Engineers gave them certain powers by just walking away and saying, you know, we're not going to handle this, but somebody has to. Your Honor, I'm not saying that somebody couldn't do this, but I believe it has to come from the legislature. And the legislature has not done it. And if you look back, even as the legislative enactment in this case, groundwater was discussed, pollution and some of those. And specifically at the time of the enactment, they said those were not parts of it. And so I don't think that they can get there with wetlands that way. And if I may, Judge, I also think this. The village could do something on their own, but this isn't a case where a village is doing it. This is a case where the county is telling the village, you must do it this way or else we will do it. And that's where I think the extraterritorial impact occurs. Well, has the village said, get out of here, county, we don't want you to participate? Because you're not representing the village, I assume, and I don't think the village is even a party in this case. Correct, Your Honor. But in my opinion, I think the problem with that is that the village was mandated to do this or they would lose all their stormwater rights. And so they had no choice but to go along with it, kind of held a gun to their head and said, you must adopt all these things, stormwater regulations, you must have these people certified by us, we're going to do the erosion control, et cetera. And if you look at this from a land and water use, which is done by a village, it's expanded enormously in the past couple decades. They keep stretching it one after the other by saying, well, we're going to add it to here and add it to there. I'm not saying that these things are good or bad. I'm saying that they should come from the legislature and they've not. And now what we have is a county through extraterritorial powers is practically regulating a whole bunch of land use and water use issues inside a village. Do we have evidence in this record that there was a gun held to the head of the village officials when they entered into this alliance? No, Your Honor. I tried to bring one village person as a witness and the court didn't allow it. So we never got into that. That actually was my belief is what they would have testified to, but we never got into that. As far as the village itself, the only thing I can tell you is there's a letter at one part when the soil issues occurs where they said you either have to either, A, get a court to say that this was improper, or B, comply with it. So I believe the village went along because that's what they felt they had to do to get along. Isn't it why the village did it? Why is that relevant? The fact is they did. I'm sorry, Your Honor? Why is it relevant why the village gave up this authority or entered into this agreement? Your Honor, I don't think it's relevant. I think the only issue that's ultimately relevant here is how do you statutorily construe this statute? The stormwater statute is very limited. In fact, the stormwater statute specifically in subsection K says if you pass it, they shall not regulate and they continue to do this. So I don't, and I'll make sure I'm answering you correctly, I don't believe that the village's intent either way is theirs. The county says we have the power, we're going to tell you how to do it, we're going to pass this regulation, this scheme, and you must apply it as we say it. We're saying that at certain parts, like now, like the wetlands, for example, they have stepped outside what limited authority they had from the legislature. The purpose of 1062 was flooding, and they solved that. There's immense information in the record that they solved it. There's immense information that if the wetlands stop, all the flooding issues are already regulated and being well done by SMC. So these additional things, the wetlands and these other things, now sedimentation, et cetera, are just additional things that somebody believes they should regulate, but they don't have the legislative authority for it. It's certainly not expressed. And then the implied part of it, even when we look at implied, as I see the case law, it usually has to be something a lot stronger than what we've said in this case, which is manifestly unreasonable. We're now to almost like a rational basis test in here. What's the purpose of 55 ILCS 555-1062-A, et cetera? The A, as I recall it, Your Honor, is the principal one that says, here's a couple different generalities as to what we're passing, which is stormwater, et cetera. If I had to give you my opinion of the purpose of this was this, was they had the flooding. They felt that some of the communities were not operating in sync with each other. Like, for example, one community may release more water and one less, and they wanted to coordinate it to make a countywide plan so all of them would release at the same time. They wanted a countywide plan to regulate flooding in the county, in the villages, and wetlands are an integral part of the regulation, because it seems like everybody agrees that wetland, without wetlands, flooding would be larger and more uncontrollable. And wetlands is an important tool in regulating flooding. And even though the wetland might be in a village, it's still comprehensively a part of a more unified program, which I think is the purpose of the statute, or one of the purposes of the statute. Section 106A.123 provides that stormwater management planning committee shall be established through a county board resolution that the county may enact ordinances prescribing rules for provisional rules and regulations for floodplain management for governing the location, width, course, and release rate of all sort of stormwater runoff, channel streams, basins of the county in accordance with the adopted stormwater management plan. So in the counties, I think includes villages, includes the whole county, and the purpose of that statute is to have some type of regulation for floodwater financial damage. Your Honor, the section F right there where it talks about the location of the width, the course, and the release rate, those are stormwater issues. The location, how wide the channel, the release rate, how much to let out. They have done that in their stormwater regulations. We're not challenging that. When it says the stormwater runoff channels, that's something that conveys water. The streams and the basins, that's the retention ponds. Respectfully, they're very limited as to the power they gave them to pass in this ordinance. And in fact, you've said it very well. Those items are not wetlands. And, in fact, at the legislative session, as I've had it in there, they even talked about groundwater, and they said no. So in 1987 when they were passing this, they were talking about floodplain and stormwater. Those things are separate from wetlands. I agree they can have similarities in the two. For example, wetlands could be low lying, so therefore it could have impacts. But wetlands could also be uplands in this case, and there's testimony to that. So that part of it, I don't think, respectfully, it gets there just by saying it's there. The location with the release rate, they have well done that already. And now to a tie in wetlands, I believe it should come from the legislature. And it is, no doubt. There's a lot of things that have wetlands, excuse me, stormwater impacts. For example, density. And if we're going to say just on the impacts, then we can say, then the county can say, well, you have less slots because then there will be less water. And this thing can go on and on. You can say, well, you have different roof materials and different driveways. So if we add it that way, we get there to an expansion that's limitless. I believe it's very clear that they were talking about the ponds and connecting them together. I think they've done a wonderful job of that. The testimony was that way. I think the wetland stuff is an addition because of the natural resource protection. I think that's totally separate. In fact, for example, the federal government doesn't regulate wetlands through flooding, for example. They're separate statutes. And I think a lot of other states do the same thing. I think it should come from the legislature, and it's not in this case. In this particular case, there is a 316-acre parcel that is in the vicinity, if not immediately adjacent. That when you have heavy rains or storms or a lot of snow, that will fill up and the water has to go somewhere. The testimony is that that water comes through the property in question, or at least the 15-some acres of the property in question. Why then doesn't that have something to do with stormwater runoff? Your Honor, I think you phrased it correctly, and that is the record that's there. Here's why, in my opinion. What they have done through the wetland regulations through this landowner, which, by the way, about 80% of the land stays open anyways in this case for this property, this 30-acre property, is what they've done is they've said, well, you have to do it by preservation, by leaving it open. For example, you could take the land and modify it by shaping the earth so you would have more usable ground and still satisfy what you just stated, which was the stormwater impact. But you don't get to do that because here, the wetland regulations are ones that deal with preservation. That's where, ultimately, from a landowner's perspective, and many landowners in this area, that's ultimately where it impacts them. Moreover, if we say that wetlands are always about flooding, as you know from the record, there's also some of their provisions, for example, the 80-150 rule, which says that you can't even flood it. In fact, when you're a landowner and there's wetlands there, you've got to make sure that you keep the water the same, not too much, not too little, or else you impact the biology of the wetlands. That's a natural resource issue. It's the reverse. So we are not suggesting that we would obliterate the wetlands and not comply with stormwater and flooding. Those two issues, stormwater and flooding, have to be complied with irrespective of the wetlands. By putting in the wetland regulations what they've done is they've imposed this enormous cost by saying it's now preserved and you can't touch it. Or if you do touch it, you can do a mitigation, which is very expensive. In this case, it would be like $400,000, etc. And so the method, even if we say it can be implied, the method that's applied to preservation is very expensive, and it doesn't ultimately provide that we are not going to comply with the floodplain or stormwater. We're not suggesting that at all. Now let's get to the brass tacks. Had your client sought permits to develop this property on that famous Memorial Day weekend? Your Honor, they did not have one from the WDO from SMC. They had something from the village. They had their, I think it was called the PUD or whatever it was, the CB. They had that permit. They did not have one from the other one. We believe respectfully that that stretch is void. We looked on how to challenge it. One option was to challenge it beforehand without doing anything. One option was afterwards. Ultimately, this is how it got challenged, so that we have a right case, if you will. And I could have been wrong. They opted on my advice. Things didn't go quite right. But it's one of these things where somebody had to challenge this because this has been going on for a long time. And if you look at this statute that says it's not expressly there, we're thinking there's some serious issues on the legal side. But if this land was going to be left, you indicated in your argument that some of this land was going to be left open pursuant to the plan that had been contemplated, why are you bringing in truckload after truckload after truckload and compacting that property? The intent was to use a little bit more. I believe it was like 2.8 acres or so. Well, that's all you got done, but there were still trucks out on the highway. I believe, Your Honor, I think the ultimate testimony, I think it was close to that. It was the perimeter where they were going. And the truckloads were because it was low-lying, it was too elevated. It was not to go further than that. And I think they had a plan that actually showed that. You'll have a chance for reply. Thank you, Your Honor. Good morning. Good morning. I'm Lyle Stalter on behalf of the County and Stormwater Management Commission. May it please the Court, you all understand the critical issues in this case. One of the things that the appellant in this case has constantly said is that wetlands is not included in Section 1062 of the county's code. The interesting thing about that argument is it's a stormwater management ordinance. Stormwater is used extensively. Stormwater is the material that is being conveyed that causes all of the flooding and the problem in Lake County. Wetlands would be included. And the evidence that the trial indicated this would be included within the language of where the stormwater is being conveyed, whether it's through channels, basins, drainage ways. The wetlands is part of that system. It's not a separate regulated function. It's not mentioned because it's not a wetland regulation. It's a stormwater management ordinance. Is there a legal definition of wetlands or when we're in the ordinance or are we here talking about sort of a term of art? It is wet because it is part of the stormwater management. There is a specific definition of wetlands that is actually in the ordinance. It's referred to isolated waters of Lake County, which incorporates wetlands. And that all came about from the Supreme Court decision in the Swank case, the Solid Waste Agency of Northern Cook County, where the Army Corps had been taking jurisdiction over wetlands and isolated wetlands based upon the migratory bird rule. And it was told that they can't take care of isolated wetlands. They've got to be connected to the waters of the U.S. So it all goes back to that. But when the wetlands were included, it was part of the isolated waters of Lake County. So it's not connected to the U.S. water system. And that's where they fall within that definition. With respect to what constitutes a wetland, there is hydraulic and hydrology and plant impacts on it. That's what actually makes up a wetland and how they're defined. And it gets into some of the rationale within the ordinance as to why they are handled in the way that they are, and why we encourage preservation, although contrary to what Mr. Rucci indicated, you can impact a wetland. You just have to compensate for it, mitigate for it, provide compensate for that stormwater function that that wetland had. You have to create another place where that water can go. Yes. That's essentially the issue. Correct. And in addition to that, based upon the evidence at trial, we had a wetland expert, Dr. Crompton, who testified the benefits that wetlands play with respect to stormwater management. It's not just a basin. It provides peak flow attenuation. It slows down the whole stormwater flow so that the downstream areas aren't impacted by this increased flow. It actually does provide and reduces the amount of water in the stormwater. It slows it down. It acts like a sponge. It absorbs some of it. Some of it infiltrates into the ground. Some of it goes back up into what's called evapotranspiration, where it goes back out through the plants and essentially, I think, becomes humidity, more common sense. So those functions and those benefits that the wetlands provide for the stormwater management system do need to be accounted for and mitigated. You're correct. Now, if I were going to pull a map of this area, would I need to go to a specialized map that would identify this as a wetland? Or is there anything that would say this is subject to the Stormwater Drainage Regulation Act or whatever it's actually called? Maybe to answer your question in a roundabout way, what happens, and this happened in this particular case, when a development comes forward within the county, SMC received notification from the village, and then they sent a letter out to the property owner saying, you know, you've got to address your stormwater management issues on this site and do an investigation as to what's on your site, what wetlands, what type of floodplain, what your base flood elevation, all of those stormwater management-related criteria or considerations that need to be taken into effect when you're doing your engineering. Yes, there are just general maps of wetlands as well. You can typically tell also from the topography, the GIS systems, whether or not this wetland was specifically mapped or identified. I don't know, but the records long, long, long ago, and the appellant had these in their possession, had indicated that there was a 16.5, at least a 16.5-acre wetland, that this water came through, 15 of it is on this particular site, an acre and a half actually is on the neighboring properties, but that there was this substantial wetland in that area, at least 15 acres, on this particular site that needed to be further studied and analyzed. And that was noted as part of this stormwater regulation, not environmental regulation. With respect to the knowledge that there was just a wetland, that was out there in the initial annexation agreement with the village and Grays Lake. There was a wetland study delineation that was done early in the process. So with respect to the fact that the wetland needed to be addressed in stormwater management, not necessarily specifically, but that initial letter from the Stormwater Management Commission would have indicated that you need to accommodate for your stormwater management. I do want to comment on one thing that Mr. Rucci had indicated to clarify for this court. He indicated that the village had a conditional use permit from, I'm sorry, the appellant had a conditional use permit from the village to go forward with this development. That's why they didn't need to get the SMC permit. Well, that conditional use permit didn't authorize the going in and filling in of wetlands, and didn't authorize engineering. In fact, in even the testimony at the trial from Mr. Waller, the president, they didn't even have final engineering from the village. The conditional use permit was just an overall concept plan as to the development here and what was going to be permitted, the number of lots, size of houses, all of those issues that go into the zoning, the planning aspect of it. But it wasn't, there was no engineering actually submitted to the village, even for a stormwater management permit, let alone the SMC wetland permit aspects of it. So they had never filed for any type of stormwater management permit, either from the village or from SMC in this case. The village had no specific wetland ordinance, did it? That is correct, Your Honor. They had adopted the WDO, and they chose to be certified for the standard provisions, but there's standard and wetlands certification in Lake County. And that gives the village a lot of flexibility. The county ordinance gives deference to villages that have adopted wetland ordinances, but in this, our case, the village did not adopt the wetland ordinance. That is correct. If the village would have adopted and wanted to enforce and certify to enforce the wetland ordinance, SMC would not be involved. It would involve them within the village. The village chose not to, opted not to be certified for the wetland provisions. And, you know, contrary to the extraterritorial jurisdiction, that gives the village the option, essentially the position that Mr. Rucci is saying, you villages, you have to do this. You have to take on this burden of enforcing wetland provisions. How the ordinance is written, because as you recognized earlier, Your Honor, it is a county-wide stormwater management ordinance. The authority in the first section of 1062 provides for that, the county to enact a county-wide ordinance. Section K is limited to when the municipality adopts and enforces. You've got to get that and in there. They've got to be adopting and enforcing the provisions. Then the county is precluded from jurisdiction. Otherwise, pursuant to 1062, the county has specific jurisdiction over the stormwater management functions. And as was recognized by Judge Hoffman in the trial court is when it comes to delegated authority and stormwater management is expressly given to the county. I don't think there's a question about that. I mean, that's what 1062 does. It expressly gives that authority to the county. That authority includes the necessarily implied authorities. And when it gets to the regulations and how regulations are set up, and the Cleaver case recognizes, Judge Hoffman indicated this, the court might not necessarily agree that this was the best way to do it, but if it's reasonable, there's not a basis for the court to overturn it. That's one of the foundations of Judge Hoffman's ruling. But you're right, Your Honor, Grayslake is not enforcing the wetland provisions of the WGO. Mr. Rucci said that he had produced or was prepared to produce someone from Grayslake to testify, and he said it was not allowed. I'm assuming the state objected or the county objected to that witness. What was the basis of the objection? Honestly, Your Honor, I do not recall that being an issue. I do not recall objecting. I do recall that a number of witnesses were produced and identified very, very late in this case, and we objected to some of them because we had absolutely no opportunity to take their deposition, to find out what they were going to testify as to what was disclosed in the case. So we had filed a number of motions. I do not have the full trial file with me to look at what it was. What you're saying is it may not necessarily have been the content, but it was the lateness or the inability to get depositions and other things in terms of a trial date. That was the basis of some of our objections, and it could have been a relevance objection as well. But I honestly don't recall. Those tended to be the two bases of our objections. There were three. One is late, never had an opportunity to pose their experts that they've identified. One was some were relevant, absolutely irrelevant to the statutory authority of the county through the water, I'm sorry, 1062 in stormwater management. And there were some objections based upon just not qualified. They disclosed somebody as an expert, and they just weren't qualified as an expert. Is there anything in the record that we do have that would indicate that Grays Lake was not in agreement with this particular stormwater management ordinance and the way it was enforced? No, actually nothing in the record contrary. And, in fact, there was an intergovernmental agreement entered into between the county and Grays Lake, specifically giving the county the authority to enforce its watershed development ordinance. So at some point previous Grays Lake actually annexed this property that's in question. That was when the intergovernmental agreement arose? No, Your Honor. The annexation, I can't remember what year it had occurred. It was, I'm thinking somewhere between the 50s and the 70s, but a long time ago, long before this case. When Grays Lake adopted the watershed development ordinance, it had certified for standard provisions, but chose not to certify for the wetland provisions. The May 24, 2008 activity, as Memorial Day, we can take advantage of a Saturday, they went and filled in 2.8 acres of the wetland. That triggered a whole line of events and legal proceedings with respect to this case. A couple of weeks later in June, they started, as you recognize, Your Honor, bringing in 100,000 cubic yards of fill for this site, which they didn't even have approved engineering on or stormwater management permits, either from the village, SMC, anybody with respect to engineering. They started bringing in a huge, huge, huge amount of dirt here. The site access was closed off, actually, by Lake County Department of Transportation for validation of its ordinance. That issue was settled out in this case. That's not before you. Subsequent to that, the ordinance violation case was filed, which is the underlying case here and the violations that we went to trial on. During the proceedings of that is when the county and Grays Lake had entered into an intergovernmental agreement, essentially recognizing the fact that Grays Lake was not enforcing the wetland provisions of the Watershed Development Ordinance and specifically giving that back to the county. It was just essentially reaffirming, confirming the relationship that had existed prior to this litigation starting. The evidence, I think, in the trial and in this record is clear with respect to the function that wetlands play in stormwater management. Both Michael Moore, the Executive Director of the Stormwater Management Commission, and Dr. Crompton, who's an expert on wetlands, testified as to, and Exhibit 13 is very critical in understanding the impact of this wetland in stormwater management function. There's a 316-acre tributary area. It's not just all one site. It's an entire area. And Exhibit 13 shows you how that tributary area drains. And all of that water, 316 acres worth of stormwater, come together and then eventually all go through this one wetland. And the interesting thing is there's only so far been 2.8 acres of impact on this wetland. That was in 2008. It's already, actually at the time of trial in 2009, that wetland had already moved to the neighboring property to the west because of the 2.8 acres of impact. In that short period of time, that water found another location to go. That's the purpose of the stormwater management function and the whole process. And the WDO is so that when you have water coming through your site, you don't shove it off on somebody else. Unfortunately, they have a lot of water tributary to their site. But, as Lake County has experienced, water doesn't care about jurisdictional boundaries. We had massive amounts of flooding in Lake County in the 80s. And as a result of that, the 1062 was enacted, giving the county the authority to enact an entire stormwater management ordinance for the entire county to recognize this and accommodate for this. So you don't shove your water off onto another municipality, shove it off onto a neighbor. But that is addressed early on in the planning stages. So we would respectfully request that you uphold the trial court's decision in this case, affirm that the wetlands are a part of the stormwater management function in this. And if you have any other questions, I'd be more than happy to answer them. Thank you very much. Thank you very much, Your Honor. Your Honor, the trial court, in its ruling, quote, the authority to regulate wetlands is not expressly granted by the statute. That's not on appeal. That's their ruling. This court, in Siegel and elsewhere, that extraterritorial powers must be expressed. In Siegel, that's at page 436. It is not to be extended by implication. At page 436, it's quoting the Keel case that goes back over 100 years. Harris Bank, absent an express grant of statutory authority, a municipality may not exercise extraterritorial governmental powers, page 114. It's clear, and I believe respectfully, that that is the test that is being applied. It's also clear to me that these expansions keep getting taken into stormwater by saying there are necessary subparts of it, how to regulate the licensing of the people that review this, the wetlands, the erosion, and these other things. And it's also clear that it's extraterritorial. The county is here to defend this, not the village. The intergovernmental agreement was adopted after the lawsuit was filed in this case. Did it change anything that had been going on, to the best of your knowledge? No, it did not, Your Honors. And I believe that, from the record, the powers that have been expanded, and they keep expanding through 1062. I mean, if we could look at what we were trying to do, which was floodplain and stormwater, the testimony is it's all done and that part's there. We keep expanding it by putting other things in there and putting it countywide. I think it's contrary to well over 100 years of this court's decisions that say it must be expressly granted. There's a place to go do this. It's the legislature. And, Your Honor, I believe that Graceland did have their own wetlands regulation. It was very small at the time, like many communities. Nothing as expansive as what was required by the county. Take an example where the wetlands, instead of being 16 acres, are 340 acres and adjoining a big part of the community. And unless controlled, a flood will inundate the village, cause great property damage. And you're taking the position that the village would have, the water system would have no control over that, nor the village. Your Honor, what I'm going to ask you to do is... Because the legislature didn't explicitly include wetland control by ordinance. I think our record was clear that we have to comply with stormwater and flooding, period. If we do something to wetlands, the testimony is in there by their experts, their executive director. If we do something to wetlands, we have to compensate for it. Because the net effect is we do not do something adverse downstream. Taking that view puts us in a different factual position. We have to comply with stormwater and flooding. We are not challenging that. So if, Your Honor, in answering your question, if we impact the wetlands and it does something to the hydrology or hydraulics, we have to compensate for that. And we can't do that unless you take the position that wetlands are untouchable and you have to leave them in their natural state. So it's obviously, it's the natural resource part of it. Nobody says that, that they have to be left in their natural state. The question is, do you have to get a permit to regulate? Your Honor, you can't do much with wetlands. I mean, once they're there, to compensate for them, like she said, and like it's in the record, like you take an acre, you've got to pay $100,000. I mean, the problem with the wetlands, it's not like, you know, do you get a bigger pipe to make it work? You can't touch it. I mean, the regulations are identifying its boundaries and stay away, put up a fence. In fact, you have to keep a 50-foot buffer. So the landowners, the home builders, the contractors, their beef with the issue is the inability to modify it to get better use of your land. That's all that this ultimately was doing anyways. It was not this theory of flood everything and downstream. We will and did comply with the floodplain part of it. I think the record shows that the impact on the 2.7 acres was very modest as far as its water impact, and we would comply with that. That's not our challenge. Your opponent doesn't agree with that. Your Honor, I think the record says that. I think I asked numerous questions of their executive director to say that I believe that that is the record. Our challenge is with the wetlands because they're extraterritorial only. Thank you very much. Thank you.